UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
SERGI HERNANDEZ GRANO,

                           Petitioner,                              **FINDINGS OF FACT AND**
                                                                         **CONCLUSIONS OF LAW**

                      -against-                                  19-CV-6970 (CS)

KATHERINE PATRICIA MARTIN,

                              Respondent.
-----------------------------------------------------x

Appearances:

Neil J. Saltzman
The Law Office of Jeremy D. Morley
New York, New York

Barry Abbott
Schwartz Sladkus Reich Greenberg Atlas LLP
New York, New York
*Counsel for Petitioner*

Richard Min
Michael Banuchis
Burger Green & Min LLP
New York, New York
*Counsel for Respondent*

Seibel, J**.**

## **BACKGROUND**

      1.      Petitioner Sergi Grano is a Spanish citizen and Respondent Katherine Patricia

Martin is a U.S. citizen.  Grano and Martin are married and have a child, to whom the Court will

refer as "D.H." or the "Child."  On October 24, 2018, Martin traveled with D.H. from Spain to

New York, and neither has returned to Spain since.

2.      On July 25, 2019, Petitioner filed this suit under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (the "Hague Convention" or "Convention"), seeking an order requiring an immediate return of the Child to Spain.

3.      On July 31, 2019, the Court set a discovery schedule and set an evidentiary hearing for September 9, 2019.  (Minute Entry dated July 31, 2019.)  On September 6, 2019, upon the parties' joint request, the Court adjourned the hearing to December 2, 2019.  The hearing took place from December 2 through 5, and then was completed on January 6, 2020.[1]  The Court ordered the parties to submit post-trial briefing no later than January 14, 2020, and permitted the parties to reply no later than January 17, 2020.

## FINDINGS OF FACT

4.      Grano was born and raised in Barcelona, and he has lived in Spain for his entire life except for a two-month period when he lived in Las Vegas, Nevada.  (Tr. at 8:8-10, 105:16-22.)  He works in his family's business as a commercial director for a group of companies in the sports field.  (*Id.* at 9:6-10.)

5.      Martin was born in the United States in 1990.  When she was a toddler, she moved to the Dominican Republic to live with her grandmother, where she remained until she graduated university.  Martin is a Dominican and U.S. citizen.  (*Id.* at 368:7-19; *see id.* at 514:19-21.)

---

[1] The parties estimated a four-day hearing, (Doc. 8 at 2), but the hearing did not finish within four days.  Due to a previously scheduled trial, the Court initially told the parties it was unable to continue the hearing immediately after December 5.  But on December 6, that previously scheduled trial settled, so the Court offered the parties the opportunity to continue the hearing on December 9.  Petitioner informed the Court that he could not finish the hearing then, so the Court adjourned the final day of the hearing until January 6.

6. Martin moved to Spain on a student visa in October 2012, when she was twenty-two years old, to attend graduate school to obtain a master's degree in clinical psychology. (*Id.* at 369:14-22.) Martin's coursework was set to take approximately two years to complete, and her plan was to move to New York once she obtained her degree. (*Id.* at 370:9-13.) Her father, grandmother, aunt, cousin, and the rest of her extended family lived in New York, and she had no family in Spain. (*Id.* at 370:14-22.)

7. In March or April 2013, Martin and Grano met on a dating website and began dating shortly thereafter. (*Id.* at 371:3-6.) Martin was still a student at the time. Early on while dating, Grano told Martin that it was always his dream to move to Las Vegas, and that he had lived there for a couple of months when he was younger. (*Id.* at 371:19-372:11.)

8. After Martin and Grano had been dating for a month or a month and a half, Grano asked Martin if her intention was to return to the United States or to stay in Spain with him. Grano explained that if it was the former, he would end the relationship. Martin told Grano that she intended to stay in Spain with him. (*Id.* at 101:25-102:5; 122:21-123:6.)

9. Sometime between July and September 2013, Martin moved into Grano's apartment. (*Id.* 15:17-19, 373:4-16.) While living together, Grano and Martin agreed that Martin, who had finished school and was not working, would handle the household chores, including cleaning the house, doing laundry, and preparing dinner. Grano told Martin early on in their relationship that he did not intend to do any chores himself. If Martin did not do her chores properly, as determined solely by Grano, Grano would yell at her. He would call Grano "stupid" and "bitch" for her failure to do chores properly. (*Id.* at 138:12-139:18, 377:6-25, 390:12-20.)

10. In late 2013 or early 2014, Martin's student visa was about to expire, so Martin and Grano registered as what Grano called a "couple-of-fact" in their local municipality. (*Id.* at 11:12-

17.)  As a couple in fact, Martin was given new legal status in Spain and granted all of the rights of a Spanish citizen except the right to vote.  Martin's new legal status was valid for five years.  (*Id.* at 12:8-14, 104:3-6.)

11.    Sometime after Martin moved in with Grano, Martin told her father that she was going to remain in Spain with Grano.  Martin's father stopped providing her with money and stopped paying her rent, health insurance, and credit card bills.  (*Id.* at 123:19-124:1, 169:17-22, 253:21-23.)  Martin then relied on Grano for financial support.  Martin stopped talking to her father for approximately two years after he cut her off.  (*Id.* at 513:10-17.)  Grano often spoke negatively about her family after they left her in Spain without financial support.  Grano called Martin's father a "motherfucker," a "piece of shit," and "human scum." (*Id.* at 376:5-20.)  Grano also expressed anger over the fact that he had to financially support Martin.  He would call Martin "stupid" and a "bitch" for her failure to support herself and for being depressed about her father cutting her off. (*Id.* at 376:2-377:5.)

12.    Once Grano started supporting Martin, Grano would yell at Martin that she needed to find a job.  But if Martin found a job that Grano did not consider to be high-earning enough to pay a housekeeper to handle the chores that Martin handled at home, Grano would instruct Martin not to take the job.  (*Id.* 378:1-379:1.)

13.    Sometime in 2014 or 2015, Grano started a serious diet and a rigorous exercise routine.  (*Id.* at 90:5-17; *see id.* at 196:8-14, 358:14-24.)  He initially went to the gym three days a week, and then began a five-day-a-week routine.  (*Id.* at 359:3-6.)  Grano would go to the gym for an hour to an hour and a half either early in the morning or around 4:00 p.m.  (*See id.* at 363:6-15; 366:10-14.)  He was unable to drink heavily or eat fattening foods at this time.  (*Id.* at 127:8-10, 359:7-11.)  When Grano was on his diet, he would yell at Martin if she cooked his food with

fattening ingredients or if she ate unhealthy food in front of him. (*Id.* at 127:14-128:10, 397:9-24.)

14. In 2014, Martin became pregnant but had a miscarriage. (*Id.* at 12:21-25, 384:6-10.) About a year later, Martin became pregnant a second time and again had a miscarriage. (*Id.* at 13:1-7.) Martin and Grano went to the doctor, who told Martin and Grano that Martin had endometriosis. (*Id.* at 14:2-10.) Martin had surgery, and the couple kept trying to get pregnant. (*Id.* at 14:13-20.)

15. After the first miscarriage, Martin and Grano got engaged. (*Id.* at 384:6-8.) Their initial intention was to have a wedding in New York, so in 2015, Martin and Grano traveled to New York to look at potential wedding venues. But after Martin's father (with whom she had achieved something of a reconciliation) failed to put down an initial deposit at the venue, as he had agreed to do, Martin and Grano called off the New York wedding. (*Id.* at 16:1-18)

16. During the aforementioned trip to New York, Grano went to Las Vegas for five days. (168:21-169:1.)

17. On January 15, 2016, Martin and Grano were married in Spain. (*Id.* at 15:5-12.) They got married at a city building in Sant Cugat del Valles and did not have an event afterward. (*Id.* at 15:11-25.) No one from Martin's family came to the wedding. (*Id.* at 15:20-22.) Martin and Grano were married under a separation-of-property regime whereby each party's property was kept separate from the other. (*Id.* at 37:24-38:2.)

18. After Martin and Grano were married, they again considered moving to Las Vegas. Grano put his apartment up for sale, and Martin began applying for jobs there. (*Id.* at 387:4-388:3.) Grano also created a spreadsheet detailing what their potential expenses and schedules would be

if they moved to Las Vegas. (R's Ex. G.)[2]  Additionally, in 2016, Martin and Grano traveled to Las Vegas for about four or five days and looked at properties to buy.  Ultimately, because of Grano's business and family obligations in Spain, they did not move.  (*See* Tr. at 390:4-18.)

19.     After their marriage, Grano continued to yell at Martin and call her names.  One of the main sources of tension revolved around Martin's unemployment.  Grano wanted Martin to find a job, but Martin had been unemployed for their entire relationship.  (*Id.* at 131:20-132:5, 377:6-378:22.)  Grano also continued to yell at Martin if her chores were not done correctly, including not cleaning, doing laundry, or cooking up to Grano's standards.  (*Id*. at 379:8-380:5.) He would sometimes scream inches away from her face, bang his hands on tables, or slam doors shut while arguing.  (*Id.* at 380:6-381:25.)  The two would argue at least once per week.  (*Id.* at 380:22-25.)  Martin would usually cry after Grano yelled at her, which would further incite Grano. (*Id.* at 386:9-12.)  After arguments, Grano would occasionally leave the apartment to either take a walk or a drive.  (*Id.* at 146:21-147:1)

20.     Sometime in 2016, Martin took a job as a customer service representative at a technology company.  (*Id.* at 136:9-21, 393:21-22.)  The commute to her office was approximately an hour and a half, and the working hours were 8:00 a.m. to 7:00 p.m. each day, so Martin did not have time to do the household chores for which Grano held her responsible.  (*Id.* at 137:4-13, 393:24-394:23.)  Grano would yell at Martin for not completing the chores, even during this time when she was employed.  (*Id.*)

21.     Grano continued to insult and degrade Martin and tell her that she did not deserve the life he provided for her.  (*Id.* at 386:19-23.)  If Martin did not complete her assigned chores up

---

[2] References to "R's Ex. _" refer to Respondent's exhibits, and references to "P's Ex. _" refer to Petitioner's exhibits.

to Grano's standards, he would make her redo the tasks. For example, he would throw out the food she cooked for him and make her cook again if he thought she used fattening ingredients, or he would throw all of the clean laundry on the floor and make her refold it if he did not like the way she had done it the first time. (*Id.* at 396:18-21, 399:7-16)

22.     Grano exerted control over other aspects of Martin's life. He instructed her how to dress and wear her hair, yelling at her if it was not the way he liked it. (*Id.* at 405:24-408:10.)

23.     Grano also repeatedly told Martin that she was unable to sexually satisfy him. And whenever Grano went out without Martin, he would want to have sex with her when he got home. He would repeatedly urge Martin to have sex with him even when she did not want to, and sometimes she would agree. (*See id.* at 408:22-409:15.)

24.     Martin would ultimately try to acquiesce to all of Grano's requests to please him and to avoid further arguments. Yet despite Martin's efforts, Grano suggested that he and Martin get a divorce three or four times within their first year of marriage. (*Id.* at 142:12-15.)

25.     On November 11, 2016, Martin learned she had become pregnant a third time. (*Id.* at 400:22-24.) Despite the numerous conversations she and Grano had recently had about divorce, they agreed to work out their marriage for the benefit of the unborn child. (*Id.* at 141:13-17.) But the arrangement did not work, and their arguments continued and intensified, in part because Martin believed that Grano was cheating on her. (*Id.* at 147:21-148:10.)

26.     Sometime after Martin became pregnant, Grano told Martin that within the house, they would not be a couple and they would sleep in separate rooms, but outside of the house, they would pretend that things were fine at home and that they were still a couple. (*Id.* at 501:2-21.) Two weeks after Grano told Martin that the two of them were separated, Grano had a relationship with another woman, and when Martin learned of the affair and confronted Grano, Grano showed

no remorse because he understood them to be separated at the time.  (*See id.* at 147:21-148:7, 505:10-14, 510:4-11.)

27.     In approximately March 2017, Martin told Grano that she was moving into his parents' home.  (*Id.* at 503:14-504:23).  Martin testified that she had no family in Spain, so his parents' home was the only place she felt she could go.  (*See id.* at 504:24-505:2.)

28.     Martin testified that she packed up her clothes and shoes in boxes and moved them all to Grano's parents' house, (*id.* at 505:20-24), though Martin also testified that she brought only "some change of clothes, because it was very close to the apartment that we used to live to his parents, so I could go at any moment to pick up some stuff," (*id.* at 504:17-20).  Martin testified that she stayed at Grano's parents' house for a couple of weeks to a month, (*id.* at 506:23-24), but Grano's parents stated she stayed there for only a few days, (*id.* at 293:11-17, 306:6-9).

29.     In April 2017, while pregnant, Martin traveled to New York.  (*Id.* at 18:18-22, 511:19-21.)  Grano and his mother drove Martin to the airport for this trip.  (*Id.* at 511:22-23.)  Grano testified that Martin wanted D.H. to be born in the United States so that D.H. could more quickly receive U.S. citizenship, and due to the issues that Martin and Grano were having, Martin wanted to get "some space" by living outside of Spain for a time.  (*Id.* at 18:23-19:4, 20:6-10.)  Martin testified that she intended to move back to the United States permanently and would return to Spain only to pick up her belongings and allow Grano and his family to meet the baby.  (*Id.* at 511:4-512:6.)  Her testimony is corroborated by her Spanish physician's notes, which indicated that Martin asked her physician to summarize her medical history because she "[wa]s going to live in another city," (R's Ex. H.), and further corroborated by the fact that while Martin was in New York, she was considering buying a day care from another woman, which would require her

presence in New York, (*see* Tr. at 515:15-518:6; R's Ex. DD).[3]  The Court finds Martin's testimony on this issue credible, and thus that when Martin traveled to New York to give birth to D.H., the parties were not in agreement as to where D.H. would live permanently once he was born, and at least not in agreement that he would live in Spain.

30.     While Martin was in New York, she had regular contact with Grano via telephone, WhatsApp, and other forms of electronic communication.  (Tr. at 20:11-15.)  Their conversations were tense, and Martin informed Grano that if their marriage was not reconciled, she did not know where she would live.  (*Id.* at 20:22-21:4.)  Grano sent Martin both text and audio messages in which he called her insulting names, such as "motherfucker" and "human scum."  (*Id.* at 165:8-23; R's Ex. J at 13739.)  Grano also regularly insulted Martin's family.  (Tr. at 167:17-23; *see* R's Ex. J at 12988.)  Additionally, Grano at times told Martin that he wanted a divorce and that he would try to get custody of their unborn child.  He also stated that he would not travel to New York for the child's birth, because it would be too painful to become attached to the child and then have to be separated from him.  (*See* Tr. at 166:14-167:5, 177:13-178:16, 527:21-24; R's Ex. J at 12977, 13746, 13976.)

31.     In a June 27, 2017 voice note that Grano sent to Martin, Grano stated that it would take "months, even a year, or more than a year" to fix their relationship.  (R's Ex. J at 17733.)  He added, "if not, if I don't want to be with you, and we don't fix our things, you go back to New York – or that is, you stay in New York, and I am left without the child.  Very well.  I still think it's blackmail."  (*Id.*)

---

[3] Martin obtained an application from the City to become a licensed day care provider and obtained information about the day care from the owner, but she never completed the application and never bought the day care.  (*See* R's Ex. DD.)

32.     When Martin was in New York, but prior to the birth of D.H., she visited a doctor and reported that she had been emotionally abused but never physically assaulted by Grano.  (R's Ex. E at 74 ("No complications in the pregnancy – except that [Martin] has left her abusive (not physically) spouse in Spain."); *id.* at 83 ("[Martin] states no physical abuse; husband unfaithful."); *id.*at 100 ("No [history of] assault."); Tr. at 796:1-4.)  Martin also did not report any physical violence when she first met with her expert in this case.  (Tr. at 486:5-8, 902:7-9.)

33.     Shortly before D.H. was born in July 2017, Grano traveled to New York, and he stayed at the Paramount Hotel.  (*Id.* at 22:4-6.)  Grano testified that when he and Martin saw each other in New York, their love was immediately rekindled.  (*Id.* at 22:23-23:2.)  Martin did not disagree.  (*See id.* at 528:16-529:1 (stating that when Grano came to New York, "it was very emotional to see each other again.  I think a lot of feelings came.").)  Martin stayed with Grano at the hotel until D.H. was born, and Martin decided that Grano would be the one person she was permitted to have present during the birth.  (*Id.* at 22:7-23:2, 24:12-15.)  Messages from around the time that D.H. was born, including the day he was born, suggest that Grano and Martin had reconciled their relationship during the period when Grano was in New York.  (*See* P's Ex. I Binder 3 at 95-96 (Martin discussing that she was "happy" with the way things were going with regard to she, Grano, and D.H., discussing that her, Grano, and D.H. were "a family," and discussing Martin's and Grano's parents' reaction to seeing Martin and Grano together).)

34.     Martin testified that Grano pressured her to be induced so that the child would be born before Grano had to travel back to Spain.  (Tr. at 530:11-531:5.)  Grano denied doing so, (*id.* at 183:20-184:12), but WhatsApp messages from July 20, 2017, show that Grano was pressuring

Martin to have her doctor induce the birth.[4] Grano stated, "So tomorrow at the latest. Tell him clearly. Or giving you permission to fly and have him in Spain. But I'll get mad if I miss it. Very." Martin responded, "Yes, I know, I told him." (P's Ex. I Binder 3 at 95.) But even that day, both parties made statements suggesting that they viewed themselves as a family unit with D.H. (*Id.* at 96 (Grano stating "We'll be 3 very soon," to which Martin responded, "Yessss").)

35. D.H. was born on July 21, 2017. (Tr. at 530:9-10.) Grano was present for D.H.'s birth but returned to Spain two-and-half days later. (*Id.* at 24:12-22.)

36. Grano testified that while he was in New York for D.H.'s birth, he and Martin agreed that Martin and D.H. would move back to Spain to live with Grano. (*Id.* at 23:3-10, 27:20-23.) Martin, however, testified that she did not think she and Grano had a firm agreement that she and D.H. would move to Spain at that time. (*Id.* at 532:15-19.) She stated that she did not seriously consider moving back to Spain until the end of the summer of 2017, after August or September. (*Id.* at 532:24-533:4; *see id.* at 535:8-10.) Messages, however, support Grano's testimony and cast doubt on Martin's. From as early as July 22, 2017, the day after D.H. was born, Martin and Grano discussed Martin's return to Spain in a way that made clear they had already agreed to it. For example, on July 22, 2017, Martin messaged Grano, "Now it'll be your turn to prepare [D.H's] things for when we come." (P's Ex. I Binder 3 at 96.) On July 23, Grano told Martin, "I'll see you in October in our home!" (*Id.* at 97.) And the following day, on July 24, 2017, Martin said to Grano, "You'll be [with D.H] very soon." (*Id.*) There are numerous similar messages.

37. It is undisputed that Grano and Martin also agreed that they would try to rehabilitate their marriage, but the parties dispute the timing of when they made that agreement. As early as

---

[4] Unless otherwise noted, when the Court references "messages" or a "message" herein, it is referring to messages sent via WhatsApp. The Court also notes that it is relying on the certified translation of these messages provided by the parties.

July 24, 2017, however, there are messages suggesting that the parties would attempt to reconcile their marriage once Martin returned to Spain. Martin said to Grano that "things will go back to their place [in Spain,]," to which Grano responded, "Yes, it seems so." (*Id.* at 98.) When Martin questioned why Grano said it seemed so, Grano said to Martin, "I still want you to show me changes and when you come, take a path (with my help, as always)," to which Martin responded, "That's what we agreed." (*Id.*)

38. Despite Grano and Martin's agreement to reunite as a couple in Spain, they still got into fights via WhatsApp while Martin and D.H. were in New York. Grano told Martin that both of them had to make changes, but he would not make changes until he saw Martin trying to improve first. (Tr. at 534:11-16.) Martin believed that Grano was going out and living the life of a single man, which upset her. (*Id.* at 533:5-11.) Martin also told Grano that certain things had to change when she returned to Spain. (*Id.* at 533:14-534:6.)

39. On September 2, 2017, Grano messaged Martin stating that he was going to "file for bankruptcy and shoot [himself]." (P's Ex. I Binder 3 at 120.) He then repeatedly suggested that he was going to commit suicide, (*id.* at 120-23), but said that Martin should still come to Barcelona with D.H. in October, (*id.* at 123). Martin responded, "You know very well that I won't go there if you're not there." (*Id.*)

40. On September 14, 2017, Grano got angry with Martin because Martin took D.H. on a trip to Pennsylvania to see her aunt, Wanda Castillo, before bringing D.H. to Spain. (*See* R's Ex. O Sept. 14, 2017 at 14:38:29-15:23:44.[5]) Grano told Martin that she should not come to Barcelona, but he still wanted D.H. to come. (*Id.* at 15:27:22-15:28:03.)

---

[5] Respondent's Exhibit O is not paginated in any way, so references to it herein will be to date and timestamp.

41.    On September 17, 2017, after arguing for some time, Grano said to Martin "Either you come or you stay, and we do what we must do. . . .  In a week, you've said 3 times that you'll get here, that you won't, that you will, that you won't anymore."  (P's Ex. I Binder 3 at 145.)  Later that day, Grano stated that he and Martin were "over," but Grano wanted the documentation establishing that D.H. was his son.  (*Id.* at 148-49.)  Martin, after ignoring multiple requests, stated, "[W]hen I'm there, I'll give them to you."  (*Id.* at 150.)  The argument continued in this fashion, going back and forth between the parties stating that they were broken up yet also making plans for when they would be in Spain together.  (*Id.* at 150-54.)

42.    Martin's friend Anayanzy Zurita Perez was scheduled to visit Martin in New York after Martin gave birth to D.H.  (Tr. at 685:25-686:3.)  Perez bought plane tickets and was planning on staying in Martin's father's home in New York.  (*Id.* at 686:4-7.)  But on September 17, 2017, Grano messaged Martin stating that if Perez met D.H. before Grano's parents did, Grano would never speak to Martin again.  (*See* P's Ex. I Binder 3 at 153.)  Grano pressured Martin to come back to Spain before Perez arrived in New York.  (*See id.*; Tr. at 650:21-651:9.)  In asking to postpone her return to Spain a week to accommodate Perez's visit, Martin messaged Grano, "I'm telling you:  Three more weeks and we will be there for a lifetime."  (P's Ex. I Binder 3 at 154.)

43.    On September 18, 2017, Grano and Martin again got in a fight about Perez's visit to New York.  Grano said to Martin, "Let's see, Patricia, if you're scared about me starting a fight for [D.H.], which would never happen if we were together or separated but remained close, but if we are 8,000 [kilometers] apart, it's logic that I would do that, as so would you."  (*Id.* at 158.)  Ultimately, Martin returned to Spain before Perez arrived, which essentially ended Martin's and Perez's friendship.  (*See* Tr. at 651:16-23, 686:8-15.)

44.     On September 19, 2017, Martin messaged Grano and stated that she wanted their relationship to change when she returned to Spain.  She told Grano that she did not want D.H. to hear them argue or to see her cry.  (P's Ex. I Binder 3 163.)  Martin added that they had a lot to work out when she returned, and Grano responded that he agreed but it was impossible to do so while they were so many miles apart.  (*Id.* at 164.)

45.     On September 21, 2017, Martin told Grano that when she came back to Spain, she wanted Grano to stop insulting her and stop yelling at her for the way she did chores around the house.  Grano responded that when Martin returned, they had to discuss the issues they had with one another and work to try to alleviate their problems.  (Tr. at 543:21-544:2.)  On the same day, Martin messaged Grano explaining that her family did not want her to return to Spain because of how unhappy she was when she previously lived with Grano.  (P's Ex. I Binder 3 at 168.)  She added, "[T]hey're just worried that things go wrong, especially now that [D.H.] is involved.  That's why I'm saying that this time it has to work out."  (*Id.*)  Grano responded that he wanted "the same, that this works out."  (*Id.*)  In response, Martin stated,

> Well, that's it.  There's something I want to ask you, and I need you to make all your best to do it. . . .  And it's that from now on you don't talk about me or make any negative comments on me with anybody, even if it's a joke.  That hurts me. . . .  And neither about the things going on in the house.  Please. . . .  [T]hat's something that you do or did, and it really hurts me.

(*Id.*)  Grano agreed.  (*Id.*)

46.     On September 24, 2017, Martin and Grano were discussing the languages that D.H. would learn while living in Barcelona, and Grano said that D.H. will have to learn Catalan in school.  (*Id.* at 172.)  Martin responded, "I hope that we're not still living in Spain by the time he goes to school."  (*Id.*)  Grano said, "I hope not.  High school particularly," to which Martin responded she was thinking they would be out of Spain before D.H. was in kindergarten.  (*Id.*; Tr.

at 549:2-7.) Grano said, "No way," suggesting they would be in Spain at least until D.H. was in kindergarten. (P's Ex. I Binder 3 at 172.)

47. On September 25, 2017, Martin made Grano promise that he would not "betray" her, adding that she was "leaving a great future for [D.H.] and for me behind here, and I'm really scared." (*Id.*) Grano swore that he would not betray Martin and stated that his intentions were for their relationship to work out, but that they would need to have conversations about their relationship and reach "agreements" upon Martin's return. (*Id.* at 172-73.)

48. On September 27, 2017, Martin messaged Grano stating that she was feeling "nostalgic" about leaving New York. (*Id.* at 174.) She explained that, while she wanted to leave, "there [wa]s also a part of [her] that [did not] want to." (*Id.*) She added that she wanted D.H. "to have a healthy relationship" with Martin's family and "for him to come every year and have his two families." (*Id.*) The latter half of the statement meant that Martin intended for D.H. to live in Spain but to visit New York once a year to maintain a relationship with both sides of his family. (Tr. at 32:17-24.) Grano agreed to this arrangement. Grano responded that he wanted to work toward their goal of moving to Las Vegas, but certain guarantees had to be in place before they could do so. (P's Ex. I Binder 3 at 175.) Martin later explained that she was "returning just for [Grano]," because she thought that D.H. would have a better future in New York than he would in Barcelona. (*Id.*)

49. On October 3, 2017, Martin returned to Spain with D.H. on a one-way ticket, and they moved into Grano's apartment. (*See* Tr. at 33:18-34:5; P's Ex. I Binder 3 at 169 (discussing one-way ticket).) Prior to returning, Martin arranged to ship most of D.H.'s things to Spain, including his crib and other furniture from his room in New York. (Tr. at 28:19-21.) Martin did not maintain a bank account, apartment, car, or job in New York once she left. (*Id.* at 816:16-22,

817:19-818:3.)  She stated she left behind only some clothes and connections with her family and friends.  (*Id.* at 817:1-24.)

50.  Martin argues that her agreement to relocate to Spain with D.H. "was conditional on [1] the improvement of the parties' relationship and [2] the cessation of certain abusive behaviors from Mr. Grano."  (Doc. 30 ("R's Mem.") ¶ 6.)  Starting with the latter, the Court finds she and Grano did not agree on such a condition at the time they agreed that Martin would return. Based on Grano's testimony at the hearing, messages he sent, and Martin's testimony, it is clear that Grano would not and did not agree to the "cessation of certain abusive behaviors."  Grano repeatedly stated at the hearing that he did not think he was ever abusive toward Martin, and thus Martin's testimony that Grano would agree to stop being "abusive" is not credible.  There were times where Grano said he would improve his behavior, but both Grano and Martin testified that Grano thought that Martin was the main cause of problems in their relationship, and that he believed it was her, not him, that had to do the majority of the work in mending their marriage. (Tr. at 176:4-21 (Grano saying the relationship problems were more Martin's fault than Grano's fault); *id.* at 534:11-16 (Martin testifying that sometimes Grano would respond, "I'm not going to change anything until you start changing")).  In fact, as noted, the only messages suggesting that Martin and Grano had an agreement to change the way they treated each other made around July 2017, the time they agreed Martin would move back to Spain, were the following:  Grano said to Martin, "I still want you to show me changes and when you come, take a path (with my help, as always)," to which Martin responded, "That's what we agreed."  (P's Ex. I Binder 3 at 98.)  These messages suggest that, if anything, the agreement Grano and Martin had was that Martin would make changes so the couple could improve their relationship.  Further, messages from September 2017 show that Martin's requests that Grano change his behavior came after the parties' agreement

that Martin would return to Spain.  For example, on September 21, 2017, Martin told Grano that her family was worried about her returning to Spain and said to Grano, "There's something I want to ask you, and I need you to make all your best to do it. . . .  And it's that from now on you don't talk about me or make any negative comments on me with anybody, even if it's a joke." (*Id.* at 168.)  This statement – specifically, Martin's *request* that Grano change his behavior – coming months after they had agreed that Martin and D.H. would relocate to Spain, establishes that the parties did not already have in place an agreement that Grano would cease his abusive behavior.  Accordingly, the Court rejects Respondent's argument that her agreement to relocate to Spain with D.H. was, at the time it was formed, mutually conditional on Grano changing his behavior.

51.    The harder question of fact that the Court must resolve is the related question of whether Martin and Grano's agreement that Martin and D.H. would move to Spain was, at the time it was made, conditional on the improvement of the parties' marriage, or, in other words, their reconciliation.  Martin testified that her move to Spain was conditional on her and Grano's reconciliation and the continuation of their marriage and cohabitation, and she testified that she explained this conditional arrangement to Grano many times, and he agreed to it.  (Tr. at 534:25-535:2, 543:21-545:23, 546:14-24, 551:1-21.)   Yet, despite thousands of messages produced between Grano and Martin, not one of them says that Martin would move back to the United States with D.H. if the parties did not reconcile their marriage in Spain, let alone that Grano agreed to such an arrangement.  Martin also testified that she informed her friend Karla Hernandez Baco, Castillo, and her father of the conditional nature of her return to Spain.  (*Id.* at 551:19-552:2.)  Yet none of these witnesses was able to credibly corroborate Martin's account.  While Baco said at the hearing that Martin messaged her via WhatsApp explaining that the move was conditional, (*id.* at 703:4-15, 704:10-21), the message was never produced in Court or turned over to Petitioner, which

suggests that no such message exists. Castillo testified that Martin told her that the move was conditional, but I am not crediting Castillo's testimony as she lied numerous times on the stand. Castillo denied making numerous statements to Martin despite Petitioner having proof that Castillo made such statements. (*Compare id.* at 932:5-8 (denying encouraging Martin to bring D.H. back to the United States), *with* P's Ex. J-2 at 10 ("[I]f I were you, I'd take my boy and come here."); *compare* Tr. at 932:18-933:3 (denying telling Martin that if Martin did not take child support from Grano, it may benefit her in the future because Grano would lose his rights to his unborn child), *with* P's Ex. J-2 at 2 ("Sometimes it's better that they don't give anything, because they won't have any rights in the future"); *and compare* Tr. at 932:2-4 (denying advising Martin to claim that Grano had beaten her), *with* P's Ex. J-2 at 7 ("Call the embassy and say . . . that he beat you, fuck him").) Additionally, Castillo had told Martin to "exaggerate everything so [Grano] gets more screwed," (P's Ex. J-2 at 3), suggesting she would lie to keep D.H. with Martin and away from Grano. Accordingly, Castillo's incredible testimony does not corroborate Martin. Finally, Martin's father did not testify, and thus cannot corroborate Martin's account. The only credible corroborating testimony came from Respondent's witness Mariel Ortega de los Santos, who testified that Martin told her that the move back to Spain after D.H. was born was conditional on Martin's reconciliation with Grano. (*Id.* at 666:14-667:10.) There were also some messages sent between the parties in September 2017 that accord with Martin's account. (*See, e.g.*, P's Ex. I Binder 3 at 123 (Martin's September 2, 2017 message to Grano, "You know very well that I won't go [to Spain] if you're not there."); *id.* at 175 (Martin's September 27 message stating that she was "returning just for [Grano]," because she thought that D.H. would have a better future in New York than he would in Barcelona).) And Martin's statements made around that time suggesting that she intended D.H. to be raised indefinitely in Spain were explicitly or implicitly tied to Martin and Grano being together

with D.H. as a family, (*see* P's Ex. I Binder 3 at 105 ("We have a lifetime for the four of us."[6]); *id.* at 174 ("I want [D.H.] to have a healthy relationship . . . [a]nd for him to come every year and have his two families."), or made to placate Grano when he was mad at her for being in New York with D.H. while he was in Spain, (*see, e.g.*, *id.* at 154 (in asking to postpone her return to Spain a week to accommodate Perez's visit, Martin messaged Grano, "I'm telling you:  Three more weeks and we will be there for a lifetime.")).

52.     Grano testified that his agreement with Martin for her to return to Spain with D.H. was in no way conditional; rather, they agreed that Martin and D.H. would move to Spain, and separate and apart from that agreement, they decided to try to reconcile their marriage.  (*See* Tr. at 23:11-15, 65:24-66:22, 266:4-13.)  Petitioner's witnesses Enryc Pallirols and Paloma Garcia Monton Sanchez, Grano's friends, testified that neither Grano nor Martin ever said that Martin's return to Spain after D.H. was born was conditional, (*see id.* at 323:22-24, 340:7-12), but this testimony is not particularly helpful as Grano and Martin would not necessarily share this information with their friends.  Grano's parents, Jorge Hernandez and Maria Mercedes Grano Font, also testified that Martin and D.H.'s return to Spain was not conditional, but neither of them were credible witnesses, as they both minimized the abuse their son inflicted on Martin and lied on the stand.  For instance, Hernandez stated that he was not aware that Grano and Martin were having relationship problems prior to Martin's travel to New York to give birth, (*id.* at 296:12-15), which cannot be true considering Grano's and Martin's testimony that they regularly argued, including arguing in front of Hernandez, as well as Hernandez's testimony that he was present in Grano and Martin's home the night of D.H.'s first haircut, just after Grano and Martin got into an argument and just before Martin called a domestic violence hotline (which will be discussed further below).

---

[6] The fourth family member was the parties' dog.  (Tr. at 875 at 16-19.)

Font too tried to minimize the issues that her son was having with Martin. For example, Font testified that the arguments that Grano and Martin had "were always because of the same thing," but also said that she never knew about what Grano and Martin argued, two facts that cannot be reconciled. (*See id.* at 307:1-11.) Additionally, Font initially testified that Martin stayed at her house while pregnant for two or three days, but later when asked if Martin stayed at her house for a few weeks, as Martin testified, Font responded that it was four days. (*Compare id.* at 306:6-11, *with id.* at 307:12-20.) While the difference between two or three days and four days is minimal, the discrepancy indicates that Font was not being truthful in her responses and could not recall exactly what her lie was. Further, both Hernandez and Font have a motive to fabricate or exaggerate, as they want their son to succeed in bringing their grandson back to Spain. Accordingly, the Court affords essentially no weight to Hernandez's and Font's testimony regarding whether Martin's move was conditional, and thus they do not corroborate Grano's testimony regarding the unconditional nature of Martin and D.H.'s relocation. There are messages, however, indicating that Grano, at least at times, planned to raise D.H. in Spain even if he and Martin had to separate, (*see* R's Ex. O Sept. 14, 2017 at 15:27:22-44 (Grano told Martin that she should not come to Barcelona, but he still wanted D.H. to come); P's Ex. I Binder 3 at 158 ("If you're scared about me starting a fight for D.H., which would never happen if we were together or separated but remained close . . . ."); *id*. at 148-49 (Grano stating he and Martin were "over" but requesting Martin send documents to Spain proving Grano was D.H.'s father); *id.* at 172-73 (Grano swearing that he has the best intentions for them to reconcile once together in Spain, but repeatedly stating that they would have to make "agreements" once Martin returned).

     53.     Considering only the credible evidence presented at the hearing, the Court finds that Martin and Grano were not in agreement on the conditional nature of the move. As a threshold

matter, none of the thousands of messages exchanged between Martin and Grano presented at the hearing show that they entered into such an agreement. Additionally, Grano credibly testified that any attempts at reconciliation were separate and apart from the parties' agreement to have D.H. grow up in Spain, which was corroborated by the messages he sent to Martin suggesting that he planned to raise D.H. in Spain whether they were together or separated. The Court also finds that it is more likely than not that Martin did not have even the unilateral intention to return to the United States if she and Grano were unable to reconcile. While some of the evidence suggests that she intended to move to Spain only if she and Grano rehabilitated their marriage – *e.g.*, her lack of connections to Spain directly prior to the move, her statements that D.H. would have better opportunities in New York, de los Santos's statement that Martin said her relocation was conditional, and Martin's ultimate return to the United States with D.H. – the preponderance of the evidence suggests that her relocation was not conditional. First, and most critically, Martin's actions once in Spain, discussed in greater detail below, overwhelmingly suggest that Martin intended her and D.H.'s move to be of an indefinite duration, which militates against finding that it was a conditional relocation. Second, while Martin expressed some trepidation prior to her relocation, she never told Grano, to whom she spoke constantly about the topic of her relocation, that her move was conditional. Rather, she made numerous statements suggesting that she planned for D.H. to have a permanent life in Spain, while still maintaining connections to Martin's family in New York by visiting during the summers. Third, Martin herself did not testify that she formed a unilateral conditional intent to return to Spain. Instead, she testified that she reached an agreement with Grano, which the Court finds, as described above, is not true. Accordingly, the Court finds that in September 2017, Grano and Martin did not share an intent to raise D.H. in Spain

conditioned on their reconciliation, nor did Martin unilaterally decide her relocation to Spain would be conditional on the same.[7]

54.     The Court finds by a preponderance of the evidence, however, that in July 2017, while Grano was in New York for D.H.'s birth, the parties agreed that Martin would bring D.H. back to Spain, and there is no evidence to suggest that Martin's intent at that time was conditioned on anything.   Numerous messages sent the days immediately before and after D.H. was born establish that the parties shared an intent for D.H. to relocate to Spain and live there with Grano and Martin.  (*See* P's Ex. I Binder 3 at 96 (Martin stating on the day that D.H. was born, "We're a family already"); *id.* (Martin stating on July 22, "Now it'll be your turn to prepare [D.H's] things for when we come"); *id.* at 97 (Grano telling Martin on July 23, "I'll see you in October in our home!"); *id.* (Martin telling Grano on July 24, "You'll be [with D.H] very soon"); *id.* at 99 (discussing on July 24 that October is when Martin and D.H. will be back in Spain); *id.* at 100 (discussing on July 25 plans to ship D.H.'s belongings to Spain).)  Yet the evidence is also clear that, at that time, the parties did not have an agreement that they would attempt to reconcile their marriage.  (*Id.* at 99 (July 24 message form Martin to Grano stating, "I'm left with the feel[ing] that we're together.  But it's something we didn't talk about," and Grano responding, "True, we didn't talk about it.").)  This is likely because Grano and Martin were, almost immediately upon Grano coming to New York, acting as if they were back together and cohabitating.  Grano testified that within a few hours after he arrived in New York in mid-July, he and Martin "started being a couple," meaning that they were reconciled and together as a family at that time.  (Tr. at 23:2.)

---

[7] Ultimately, however, whether the parties entered into a conditional agreement in September 2017 does not change the outcome of this case.  As discussed below, Martin and Grano's marriage was not rehabilitated after Martin returned to Spain, and thus the condition was never met.  And even if Martin had the unilateral intention to return to the United States, Grano did not share that intent with her.

Martin's testimony seemingly corroborated Grano's account, or at the very least did not rebut it. (*See id.* at 528:16-529:1 ("Q. And did you two stay together when he came to New York? A. Yes. Q. Why? A. Um, I remember that after all those months fighting and everything, that we see each other, it was very emotional to see each other again. I think a lot of feelings came. I was with my big belly, I remember that. And I don't know, I don't know, I don't know, I don't know what to say about that, why I stay with him or, I don't know, it was a moment, a long time."); *see also id.* at 532:14 (stating that Grano was treating her well while he was in New York).) Put differently, Grano and Martin did not then agree to rehabilitate their marriage because it would have been unnecessary – they were already acting as if their marriage was rehabilitated from the period of July 16 through July 23, 2017, while Grano was in New York. The parties were reconciled, cohabitating, and making plans to restart their life together in Spain with D.H. Accordingly, the Court finds that at that time the parties had a shared and unconditional intent to live in Spain as a family.

55. Beginning the day after Grano returned to Spain, Martin started expressing her fears that Grano would sleep with other women, (*see* P's Ex. I Binder 3 at 96), and then within a few months, started making Grano promise that he would not cheat on or disrespect her, (*see, e.g.*, *id.* at 172). Grano too expressed concerns about their reconciliation and at times suggested he did not want Martin to come to Spain. (R's Ex. O Sept. 14, 2017 at 15:27:22.) But that the parties expressed trepidation about their reunification in Spain or otherwise changed their intent does not change the fact that they shared an intent for D.H.'s permanent residence to be Spain during this week-long span in July 2017.[8]

---

[8] Neither party argues that Las Vegas is or was intended to be D.H.'s habitual residence, and although the parties discussed possibly moving to Las Vegas after July 2017, there is no evidence

56.     Once Martin returned to Spain, she stayed home and took care of D.H.  She was still responsible for many household chores, but Grano also hired a maid to work three hours per day to clean the apartment.  (*See* Tr. at 202:2-21.)

57.     When Martin first moved back to Spain, the parties' relationship was acceptable, but after approximately two weeks, they began arguing again.  (*Id.* at 652:22-653:1.)  Grano screamed at Martin if she did not do things the way that Grano expected her to, including relating to D.H.  Grano also yelled at Martin for giving too much attention to D.H. and not enough to Grano.  (*Id.* at 731:6-12.)  Martin testified that she could never live up to Grano's standards, and he was constantly yelling at her.  (*See id.* at 655:22-656:17.)  On at least four occasions, the arguments occurred in a car with D.H. inside, and Grano would drive fast and recklessly while yelling at Martin.  (*Id.* at 654:10-25.)  Martin also testified that Grano yelled at D.H. "a couple of times," which caused the Child to cry.  (*Id.* at 731:16-732:6.)

58.     Despite the fighting, Martin and Grano began looking at schools for D.H.  (*Id.* at 43:20-22.)  They looked at at least two schools, including Agora International School ("Agora").  (*Id.* at 44:17-18.)  Agora was a school for children as young as one-year old, and students could remain there until they went to university.  (*Id.* at 44:24-45:1.)  It was a private school that required yearly tuition.  (*Id.* at 45:2-6.)  In evaluating Agora, Martin was especially interested in its language programs and asked questions about music opportunities available to students when they turn seven or eight.  (*Id.* at 47:18-48:2.)  She also asked about which "precollege . . . fields" Agora offered its students when they turn sixteen, as schools in Spain require some level of specialization prior to graduation.  (*See id.* at 48:3-7.)  Martin and Grano agreed that D.H. would enroll in Agora.

_____

that they ever got far enough along in that process to have shared an intent for Las Vegas to be D.H.'s permanent home.

(*Id.* at 48:8-15.) Initially, the plan was for him to start in September 2018, and for Martin to get a job by then to help pay D.H.'s tuition. (*Id.* at 48:10-12, 57:19-58:8, 835:5-9, 837:23-838:8, 839:8-14.)

59.     In December 2017, Martin and Grano agreed to buy a house in Spain. (*Id.* at 35:8-12.) They had visited a property in Spain prior to D.H.'s birth and ultimately decided not to buy it, but once Martin returned to Spain, the pair again looked at properties, and this time agreed to buy one. (*See id.* at 812:23-813:8.) The house was under construction, and both Martin and Grano were involved in suggesting improvements and changes to the architect during the construction process, and both were involved in furnishing the house. (*Id.* at 813:17-815:20, 846:1-18.) The architect overseeing the project was Grano's father's close friend, and he said that both parties insisted on certain things when planning the renovations. (*Id.* at 18:10-14, 354:3-9, 348:21-24.)

60.     In early 2018, Grano and Martin's arguments began to intensify. On March 16, 2018, Grano messaged Martin, stating that she is a "bad person" and "do[es] all this because [she] know[s] that the child keeps [Grano] with [her]" even though their relationship was over. (P's Ex. I Binder 2 Tab 4 at 20.)[9] Grano added, "I'll pay for your ticket to USA but before that, we sign the divorce and fair agreements about me with [D.H.]." (*Id.*) Grano told Martin that he decided "not to be with [her] anymore," and he stated, "Now you must decide if you want to separate smoothly and that [D.H] and I have fair conditions or if you leave straightaway and you keep messing with me like you've been doing so far with my son." (*Id.*) Martin said she could not decide at that moment. (*Id.*) Grano responded, "Very well. . . . I'm meeting the lawyer on Monday as well to file for divorce." (*Id.*) He was clear, however, that he was "breaking up with [Martin], not [his] son." (*Id.*) Grano concluded that he and Martin were "over," but before Martin took

_____

[9] All subsequent citations to "P's Ex. I Binder 2" refer to Tab 4 of that Binder.

D.H. anywhere, she had to inform Grano where they were going and Grano would have to agree. (*Id.* Ex. I Binder 2 at 21.) Grano stated, "And here it is all in writing. So then the judge sees everything. I haven't kicked you out. And I have given you the option to agree and pay for your trip to USA if it is your wish to leave." (*Id.* Ex. I Binder 2 at 21-22.) Martin responded, "I'm not staying here to live and go through everything you put me through a year ago and even less with the baby," to which Grano stated, "And if your wish is to stay, I'm willing to help with everything, what's more, I prefer it and you know it. So I have my son close and I can see him daily." (*Id.* Ex. I Binder 2 at 22.) Despite these messages, Grano and Martin did not break up or get divorced in early 2018.

61.     On April 10, 2018, Martin traveled with D.H. to New York to visit her family. (Tr. at 38:24-39:7.) While in New York, Martin registered D.H. as a Spanish citizen at the Spanish Consulate. (*Id.* at 649:6-21; P's Ex. G.) Grano pressured Martin to do this, and Martin agreed because, among other things, registering D.H. as a Spanish citizen would grant him access to Spain's public healthcare. Martin also did not want D.H. to be "illegal" while in Spain. (Tr. at 649:22-25, 652:5-14.) Just a week before the trip, Grano asked Martin if he could go out with friends while she was in New York or if he "should be locked up at home," because Grano was afraid that Martin would suspect that he was cheating on her and then not bring D.H. back to Spain or "blackmail" Grano. (P's Ex. I Binder 2 at 24.) Martin said it bothered her that Grano had to "go out to party" while she was gone, but that she would not prohibit Grano from doing so. (*Id.*)

62.     While Martin was in New York, she told Grano that D.H. would have to come visit New York once or twice a year while they were living in Spain. Martin added that when D.H. was old enough to fly alone, he could spend half the summer in New York. (P's Ex. I Binder 2 at 27.)

63.     A few weeks later, Martin traveled back to Spain with D.H.  On May 23, 2018, Martin went to the City Hall in Sant Cugat and, using the Spanish citizenship she obtained for D.H. in New York, registered D.H. as a resident of the town.  (Tr. at 41:14-20; P's Ex. F.)  Under Spanish law, D.H. was a legal resident of Sant Cugat, and any removal of him from there would require the consent of Martin and Grano.  (*See* Tr. at 586:1-4.)

64.     In July 2018, the work on the house that Martin and Grano purchased was completed, and the pair signed the deed to the new house.  (*See id.* at 48:24-49:1.)  Because Martin and Grano were married under a separation-of-property regime, and because Martin did not work or otherwise have an income, Martin was unable to get a mortgage for the purchase of the house.  (*Id.* at 37:24-38:12.)  Thus Grano alone took out the mortgage, but under Spanish law, Martin still had to sign the mortgage documents.  (*Id.* at 50:15-21.)  At the signing, Martin and Grano were present, as well as Grano's father, a notary public, two people from the bank, and two people representing the seller of the house.  (*Id.* at 50:22-51:1.)  The notary public read the entire document aloud and explained its contents to the parties present.  (*Id.* at 51:2-4, 647:20-24.)  One of the lines in the contract stated that the house was to be Grano and Martin's "usual and convivial" home.  (P's Ex. P; Tr. at 50:10-14.)  The notary explained to Martin that usual meant everyday and convivial home meant it was a shared, family home.  (Tr. at 53:1-4.)  Martin signed the document.  (*Id.* at 646:21-23.)  Martin recalled that the document was explained to her, but she did not think that by signing it, it meant she would stay in Spain permanently.  (*Id.* at 647:20-648:12.)  Grano asked Martin if she would sign a document waiving all rights to the house if the couple later separated, but Martin refused to do so.  (*Id.* at 861:9-16.)

65.     After the signing, Grano received the loan and closed on the house, and the parties started living there as a family with D.H.  (*Id.* at 60:4-9.)  The electricity bill of the new home was in Martin's name.  (*Id.* at 60:22-25; P's Ex. Q.)

66.     The new house was farther away from the downtown area than the previous apartment in which Martin and Grano had been living, so Grano agreed to get Martin a car once they moved.  (*See* Tr. at 845:8-16.)  They first went to a Peugeot dealer, and then a Nissan dealership, but ultimately Grano bought an Audi, which Martin preferred.  (*Id.* at 55:2-56:11, 844:1-8.)

67.     From approximately August through October 2018, Grano provided Martin with about €40,000.  (*Id.* at 100:9-25.)  This money was used to take care of household needs, such as buying furniture or groceries, and anything beyond that could be used by Martin for discretionary spending, though Martin said that Grano did not provide enough for her to use the money on herself beyond weekly trips to the salon.  (*See id.* at 645:9-24, 820:15-821:19.)

68.     Throughout the period when Martin returned to Spain with D.H., she continued to have arguments with Grano regarding her not having a job, her appearance, and her failure to do chores up to Grano's standards.  During the summer of 2018, Martin and Grano's arguments intensified and were occurring four or five times per week.  (*See id.* at 735:8-15.)  For instance, Grano screamed at Martin when D.H. spit up on the couch and when D.H. was loud and fussy at a restaurant.  (*Id.* at 655:1-21, 732:17-733:8.)  Martin testified that Grano was in constant fear that Martin was going to take D.H. back to the United States, a fear which he often shared with his parents.  (*Id.* at 552:5-16.)  But despite Grano's fear and despite Grano and Martin's arguments, in the summer of 2018, Martin told Grano that she wanted to have more children, and while Grano was at first dismissive of the idea, he eventually became receptive.  (*Id.* at 53:13-20, 305:8-20.)

69.     At one point, Grano took D.H.'s passport because he feared that Martin was going to take D.H. to the United States. (*Id.* at 207:4-22.) But when Martin told Grano that her grandmother was sick, Grano agreed to give her D.H.'s passport back so that she could travel with D.H. to see her ailing grandmother, on the assumption that Martin and D.H. would return to Spain after the trip. (*Id.* at 268:7-269:4.)

70.     Because the parties agreed that Martin was going to take a multiweek trip with D.H. to New York in the fall, and because Martin still did not have a job and could not help pay D.H's tuition at Agora, the parties agreed that they would not enroll D.H. in school in September 2018 as they initially planned, but instead would have him start in January 2019. (*Id.* at 57:9-58:8, 834:22-835:13.)

71.     On or around September 28, 2019, Martin and Grano took D.H. to get his first haircut, but they were arguing intensely. (*See id.* at 739:7-740:1.) Grano had tasked Martin with getting some sort of refund from a maid service, but Grano did not receive the reimbursement when he expected to, so he screamed at Martin while driving at a very high rate of speed on the way to and from the barbershop. (*Id.* at 739:8-16, 740:2-11.) When they returned home, Martin was in the kitchen holding D.H. (*Id.* at 741:5-6.) Grano yelled at Martin, but Martin was not responding. Grano then grabbed Martin by the arm with which she was holding D.H., and Grano slapped Martin's arm, leaving a mark. (*See id.* at 740:24-741:15.) D.H. and Martin began crying. (*Id.* at 741:12-15.) Grano denied ever grabbing or slapping Martin's arm. (*Id.* at 231:25-232:5.) When Grano saw Martin and D.H. crying, he left the kitchen. (*Id.* at 741:23-25.) Sometime later, Grano's parents came over, and both Grano and Martin told them what happened. (*See id.* at 742:18-743:14.) When Grano's parents left, Grano got angry because he believed his parents had sided with Martin. (*Id.* at 745:2-6.) Grano started yelling at Martin and banging his hand on the

kitchen island, at which point Martin ran into D.H.'s room and went into D.H.'s closet. (*Id.* at 745:6-9.) While in the closet, Martin left a voice note for her friend Baco asking what to do. (*Id.* at 745:12-15; R's Ex. S.) Martin also testified that she called a domestic violence hotline, but the hotline said she had to call back when Grano was not present. (Tr. at 747:1-19.) At some point later, Martin contacted the U.S. Embassy in Barcelona to report the abuse. (*See* R's Ex. Y.)

72.    Martin testified that after the September 28 altercation, she began sleeping in D.H.'s bedroom, and she left a bag under his crib packed with some clothes and travel documents. (Tr. at 749:2-24.) Martin testified that at this time, she made up her mind that she would move back to New York. (*Id.* at 751:23-752:7.) She did not, however, share this decision with Grano.

73.    Martin testified that in addition to the incident described above, Grano slapped her across the face and put his hand over her mouth on several occasions. (*Id.* at 414:15-24, 904:17-25.) Grano denied ever doing so. (*Id.* at 231:24-232:8.)

74.    Martin suggested that based on the way Grano behaved toward D.H. on September 28, as well as on many other occasions, Grano is not fit to raise D.H. She testified that while she and D.H. lived in Spain from October 2017 to October 2018, Martin spent nearly twenty-four hours per day with D.H., while Grano spent only a couple of hours each day with the Child. (*Id.* at 553:22-25.) Grano never changed D.H.'s diaper while in Spain and fed and bathed D.H. only once or twice. (*Id.* at 553:10-15, 555:6-13, 556:3-8.) Martin said she left D.H. alone with Grano on only one occasion, and Grano had a difficult time taking care of the Child. (*Id.* at 554:13-16.) On three occasions, Martin had to take D.H. to a hospital, but Grano never accompanied them. (*See id.* at 558:10-559:15.)

75.    On October 23 or 24, 2018, Martin traveled with D.H. to New York. (*Id.* 871:11-13.) Martin had told Grano that the purpose of the trip was to visit her sick grandmother and that

she would return in late November. (*Id.* at 58:21-59:13, 835:1-4.) Grano's father drove Martin to the airport. Martin's bags were packed for a typical three-week trip, not for a permanent move. (*Id.* at 284:25-285:17.)

76. For the first three weeks that Martin was in New York, she communicated with Grano as she had on her previous trips, but as time went on, the communication became less frequent. Martin told Grano that she intended to extend her stay in New York for a few days. Grano told Martin that she could stay in New York but that she had to allow Grano to retrieve D.H. and bring him back to Spain. When Martin refused, Grano realized that Martin had no intention of returning to Spain with D.H. (*See id.* at 61:24-63:11.)

77. Martin testified that while D.H. lived in Spain, he was introverted and overly attached to her. But since moving to New York, D.H. started speaking more and his demeanor changed for the better. (*Id.* at 752:20-753:6.)

78. Around March 2019, Grano filed a petition in Spain seeking a declaration that Martin illegally removed D.H. from Spain. (*Id.* at 71:17-25.) Shortly thereafter, Grano also commenced divorce and custody proceedings in Spain. (*Id.* at 76:22-23.) On July 2, 2019, the Spanish Court issued a decision that Martin's retention of D.H. in the United States violated Grano's rights under Spanish law, (R's Ex. LL), and on September 5, 2019, the Spanish court issued an order granting Grano provisional custody of D.H., (R's Ex. OO). Martin appeared in the Spanish proceedings for the limited purpose of petitioning to nullify the court's orders because, she argued, her signature had been forged on the "acknowledgment of receipt of the notification of [Grano's] claim." (P's Ex. JJ at 1.) The Spanish court denied her petition. (*Id.* at 4.)

79. Martin believes that, because of the divorce proceedings initiated by Grano, she no longer enjoys legal status in Spain. (*See* Tr. at 760:6-9.)

80.    In May 2019, Martin filed a custody petition in Westchester County family court. (*See id.* at 753:7-13, 793:2-16.)  Shortly thereafter, Martin learned that Grano was coming to New York to oppose Martin's custody petition, and she was afraid that Grano might hurt her, so she filed and obtained an order of protection against him.  (*See id.* at 79:24-80:4, 753:7-16, 792:4-20.) On June 20, 2019, the Westchester family court stayed the custody proceedings pursuant to Article 16 of the Hague Convention.

81.    The factual findings the Court has made to this point are based in part on the credibility determinations made during the hearing, which at times the Court has explained explicitly and at other times are implicit in the facts described.  That said, the Court finds it necessary to expand further on the credibility of the parties in this case.  Starting with Grano, he minimized his abuse of Martin, either because he was lying to the Court or because he does not understand that his behavior was abusive.  As the Court will describe in greater detail below, Grano exerted coercive control over Martin – even during the hearing it at times looked like he was trying to influence her while she was on the witness stand – yet he repeatedly tried to downplay the abusive nature of their relationship and its impact on Martin.  For instance, Grano said he did not, nor would he ever, pressure Martin to have doctors induce the child's birth, but messages show that he did just that.  Additionally, Grano stated that he did not believe he was abusive toward Martin, despite being shown numerous messages where he viciously called her disparaging and hurtful names and told her she was worthless.  Further, Grano stated that he had never seen Martin cry during an argument, which the Court finds incredible considering her credible testimony that she regularly cried when Grano yelled at or demeaned her, the fact that she regularly cried during the hearing, and human nature.  Martin too, however, was not always credible during the hearing and exaggerated some of her allegations against Grano.  As explained in greater detail below, the

Court finds that, with one exception, she exaggerated or fabricated allegations regarding physical abuse Grano inflicted on her. Additionally, as noted above, her testimony that she and Grano did not have an agreement that she would move back to Spain while Grano was in New York for the birth of D.H. is contradicted by numerous messages she sent in July 2017 that establish she had decided to move back to Spain no later than July 22. Both Grano and Martin have thus shown a tendency to try to bend the truth or lie in judicial proceedings to benefit their positions. Additionally, as noted above, the Court found that Grano's parents, Hernandez and Font, as well as Martin's aunt, Castillo, were not credible witnesses. (*See supra* ¶¶ 51-52.)

82.     Both parties retained experts who testified at the hearing. Dr. Peter Favaro, Martin's expert on intimate partner abuse and coercive control, conducted an analysis of Martin and Grano's relationship. In doing so, Dr. Favaro assumed the truth of everything Martin reported to him and did not speak with Grano, D.H., or any other witnesses. Dr. Favaro did not intend to conduct a comparative analysis, and his goal was not to assess credibility. Rather, his intent was to evaluate Martin and Grano's relationship assuming what Martin reported was accurate. On this score, Dr. Favaro determined that Grano exerted coercive control over Martin and that Martin's experience was consistent with battered wife syndrome, as she exhibited the symptoms of catastrophic stress, anxiety, depression, and low self-esteem. Dr. Favaro testified that a victim of coercive control is incapable of establishing an identity separate and apart from what the abuser says the victim's identity should be. Further, the abuser obliterates the decision-making of the victim. Dr. Favaro noted that a child who witnesses coercive control or lives in a coercively controlling environment receives the same type of emotional trauma as a child who is directly abused. In fact, even in utero, a child's brain may develop differently if his mother is the victim of coercive control.

83.     Based on the evidence presented in this case, Grano did coercively control Martin. The WhatsApp messages and voice notes show that Grano called Martin degrading names and tried to make her feel worthless on a regular basis. Further, he essentially admitted that he tasked her with completing housework and yelled at and insulted her if it was not done to his liking. Moreover, Martin had no family in Spain and was reliant on Grano for financial support, tipping the scales of control even greater in Grano's favor. Finally, Martin credibly testified that Grano tried to control all aspects of her life, including her employment, her appearance, and the way she raised D.H. Grano did not credibly refute any of these allegations.

84.     The Court also finds by a preponderance of the evidence that on September 28, 2018, Grano grabbed and slapped Martin's arm while she was holding D.H. This incident so frightened Martin that she hid in the closet with D.H., called Baco, who is a human rights lawyer, and called a Spanish domestic violence hotline. That said, while any domestic violence is by its very nature a severe and major problem, the other physical abuse alleged here either did not happen or was exaggerated by Martin. While Martin now alleges that Grano slapped her and covered her mouth on several occasions, Grano denies the allegations, and there is no corroborating evidence supporting Martin's account. To the contrary, Martin repeatedly told medical personnel, including her doctor in New York and her expert in this case, that Grano never physically abused her. While it is not unusual for a victim to hide the abuse that she suffers, here Martin did report the emotional abuse to her doctors and her expert, but she specifically "state[d] no physical abuse," (R's Ex. E at 83), and it is unlikely that Martin would be too embarrassed to allege physical abuse while not feeling the same way about reporting Grano's degrading emotional abuse.

85.     Petitioner also retained an expert for this case: Crestina Diaz Malnero Fernandez, an expert in Spanish family law and ameliorative and protective measures for victims of domestic

abuse in Spain. She explained that Spanish law requires that no more than seventy-two hours can pass between a complaint of domestic abuse and the parties appearing in a specialized domestic violence court. The seventy-two-hour limit is a maximum, and often these cases are more quickly addressed. In the domestic violence courts, psychological abuse is considered the same as physical abuse. Once an allegation of domestic abuse is made, the police department will, among other things, detain the alleged abuser for questioning. After the police department collects its evidence, a specialized district attorney presents the case in front of a specialized judge in the domestic violence court. It is a civil proceeding, and if children are involved, the standard the judge applies when determining if an order of protection is appropriate is the "best interests of the child" standard. The judge has broad discretion to implement whatever measures she believes are necessary to protect the child and victim. For example, drug treatment programs or mandated therapy are often ordered by domestic violence judges.

86.     Fernandez also testified that if allegations of domestic abuse are made in family court, and the family court believes that there is a chance that such allegations are credible, the family court loses jurisdiction over the case and must transfer it to the domestic violence court. Accordingly, even if there is no mention of domestic abuse until a hearing in a family court case, if the family court judge finds the allegations to be credible, she must transfer the case to the domestic violence court.

87.     Here, even though Grano adjudicated his custody proceeding to the point the he obtained provisional custody, Martin could still file a new claim at the domestic violence court, and any order of protection or other ruling of the domestic violence court would supersede that of the family court.

**<u>CONCLUSIONS OF LAW</u>**

88.     The Hague Convention was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  Hague Convention pmbl.  "The Convention's drafters were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken."  *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) (internal quotation marks and alterations omitted).  "The Convention's remedy of repatriation is designed to preserve the status quo in the child's country of habitual residence and deter parents from crossing international boundaries in search of a more sympathetic court."  *Souratgar v. Lee*, 720 F.3d 96, 102 (2d Cir. 2013) (internal quotation marks omitted).  To that end, "[t]he Convention does not establish substantive standards for resolving the merits of any underlying custody dispute. Rather, the Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings."  *Mota*, 692 F.3d at 112 (citation omitted).

89.     To prevail on a claim under the Hague Convention, a petitioner must show by a preponderance of the evidence that (1) "the child was habitually resident in one State and has been removed to or retained in a different State"; (2) "the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence"; and (3) "the petitioner was exercising those rights at the time of the removal or retention."  *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005).[10]  Here, only the first element of Petitioner's case – habitual residence – is in dispute.

---

[10] The Convention provides exceptions that apply even if the petitioner makes out his case, (Hague Convention art. 13), one of which will be discussed below.

### Habitual Residence

90.     "The Hague Convention, itself, does not provide any definition of 'habitually resident.'"  *Id.* at 131.  The Second Circuit had instructed district courts to apply the two-part test set forth in *Gitter v. Gitter*:

> "First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared.  In making this determination the court should look, as always in determining intent, at actions as well as declarations.    Normally the shared intent of the parents should control the habitual residence of the child.    Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent."

*Hofmann v. Sender*, 716 F.3d 282, 291-92 (2d Cir. 2013) (quoting *Gitter*, 396 F.3d at 134); *see Saada v. Golan*, 930 F.3d 533, 539 (2d Cir. 2019).[11]  But on February 25, 2020, the Supreme Court clarified that "a child's habitual residence depends on the totality of the circumstances specific to the case.  An actual agreement between the parents is not necessary to establish an infant's habitual residence."  *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020).  The Court noted that "locating a child's home is a fact-driven inquiry," and "courts must be sensitive to the unique circumstances of the case and informed by common sense."  *Id.* at *5 (internal quotation marks omitted).  Accordingly, "[b]ecause children, especially those too young or otherwise unable to acclimate,

---

[11] An analysis of acclimatization – the second prong of the *Gitter* test – is not necessarily appropriate where the child is very young.  *Pignoloni v. Gallagher*, No. 12-CV-3305, 2012 WL 5904440, at *48 n.49 (E.D.N.Y. Nov. 25, 2012), *aff'd*, 555 F. App'x 112 (2d Cir. 2014) (summary order); *see Guzzo v. Cristofano*, 719 F.3d 100, 108 n.7 (2d Cir. 2013) ("When a child is younger, with less sense of the surrounding environment, courts place more emphasis on the intentions of the parents."); *Nissim v. Kirsh*, 394 F. Supp. 3d 386, 393 (S.D.N.Y. 2019) ("[A]lthough the test is two-pronged, analyzing the intention of the persons entitled to fix a child's place of residence is the most important aspect of the analysis, particularly when a child is young.").  Because D.H. was an infant and toddler throughout the relevant period, and because neither party is making an acclimatization argument here, the Court finds questions of acclimatization irrelevant.

depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases." *Id.* In other words, the parents' last shared intent is a relevant consideration, but it is by no means dispositive of the habitual residence inquiry. "[A] wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" *Id.* at *7. "The bottom line: There are no categorical requirements for establishing a child's habitual residence – least of all an actual-agreement requirement for infants." *Id.* The Petitioner "bears the burden of establishing by a preponderance of the evidence a child's habitual residence at the time of the contested removal." *Guzzo v. Cristofano*, 719 F.3d 100, 107 (2d Cir. 2013).

91.     A child may be found to have no habitual residence, in which case the Hague Convention does not apply, and the petition must be dismissed. *See, e.g.*, *Carlwig v. Carlwig* (*In re A.L.C.*), 607 F. App'x 658, 662-63 (9th Cir 2015) (child "born under a cloud of disagreement between parents over the child's habitual residence . . . had no habitual residence, [so] no further analysis of this matter under the Convention and its implementing legislation is possible, as the Convention does not apply to a child who was never wrongfully removed or retained."); *Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003) (where parents' "conflict is contemporaneous with the birth of the child, no habitual residence may ever come into existence"). But the Supreme Court's recent decision in *Monasky* has mostly undone the no-habitual-residence line of cases stemming from a lack of parental shared intent, at least for infants. The Court explained that the imposition of a "categorical actual-agreement requirement" is inappropriate because it "would leave many infants without a habitual residence, and therefore outside the Convention's domain," thus "creat[ing] a presumption of no habitual residence for infants, leaving the population most

vulnerable to abduction the least protected," which is not what the Convention's signatories intended. *See Monasky*, 140 S. Ct. at 728.

92.     Where both parents intend that a child's relocation is conditional, it will not be deemed the parents' last shared intent if the condition precedent is not met. *Mota*, 692 F3d at 115, *see Hofmann*, 716 F.3d at 293 (no habitual residence in United States where intent to move to United States "was limited by [petitioner's] conditional agreement that the relocation was to be accomplished as a family," but respondent later unilaterally decided to move to United States without petitioner); *Gitter*, 396 F.3d at 135 (finding no clear error in district court's ruling that Israel was not child's habitual residence where respondent moved there "on a conditional basis – namely, that [respondent] would be satisfied with the new arrangements") (internal quotation marks omitted); *Ruiz v. Tenorio*, 392 F.3d 1247, 1257 (11th Cir. 2004) (*per curiam*)(mother did not abandon United States as habitual residence where, among other things, her "intention with respect to the move to Mexico was clearly conditional upon improvements in their marriage, was expressed and in the open, and was well-known to [father]"); *see also Calixto v. Lesmes*, 909 F.3d 1079, 1089-90 (11th Cir. 2018) (collecting cases where "a parent's relocation with a child from one country to another was conditioned upon the occurrence of certain events, [such that] the first country would remain the child's habitual residence if those events did not come to pass"); *Guzzo*, 719 F.3d at 111 (finding habitual residence did not change from United States to Italy where, among other things, the mother's "willingness to attempt a reconciliation in Italy was clearly premised on the understanding that, should the reconciliation prove unsuccessful," the child would continue to reside in the United States); *Maxwell*, 588 F.3d at 252 (collecting cases where "courts have refused to find a change in habitual residence because one parent intended to move to the new country of residence on a trial or conditional basis").  Additionally, if only one party has a

conditional intent to relocate, and the other party does not, "it cannot be said the parents 'shared an intent.'" *Mota*, 692 F.3d at 115. Following *Monasky*, the parties' last shared intent is still a relevant consideration, although it is not dispositive.

93.     Starting from the present and moving backward, neither party argues that the United States is D.H.'s habitual residence.[12]  It is also undisputed that some point prior to October 2017, the parties shared an intent to live with D.H. in Spain.  What is disputed, however, is when the parties entered into that agreement, whether that agreement was conditional, and what those conditions were.

94.     Respondent argues that the parties did not share any intent prior to September 2017, and thus D.H. has no habitual residence and the Hague Convention does not apply.  But as noted, the Supreme Court has cautioned lower courts against adopting this argument. *See Monasky*, 140 S. Ct. at 728.  Additionally, Martin's argument fails because the Court finds that the parties did share an intent to move to Spain as a family in July 2017.  At that time, when Grano was in New York for D.H.'s birth, the parties were staying together and living as a couple, and they agreed that they would live as a family with D.H. in Spain.  Despite Martin's argument that she did not start

---

[12] Even if Martin did so argue, the Court would not find that the United States is D.H.'s habitual residence.  Martin and Grano never agreed that D.H. would relocate to the United States, and while shared intent is not dispositive, it is still a relevant consideration.  Also, D.H. had spent the majority of his life in Spain when Grano removed him to the United States.  While it took Grano seven months to bring the petition, most of the delay is attributable to the fact that Martin had planned to be in New York for a month to visit her grandmother, and after that month passed, Martin strung Grano along regarding her return to Spain.  (*See* Tr. at 68:17-24 (Martin told Grano that she would be in Spain for only a few days more in November 2018); *id.* at 69:18-70:23 (Grano testified that as late as February or March 2019, Martin told him that she would return to Spain with D.H.).)  After that, legal proceedings in Spain and the United States had to be undertaken.  D.H.'s presence in the United States since October 2018 is the result of Martin's unilateral decision to bring him here, which is what the Convention aims to prevent, not endorse.  Accordingly, the United States is not D.H.'s habitual residence.

considering moving back to Spain until September 2017, Grano's testimony, as well as numerous messages, establish that the couple had agreed to Martin's relocation with D.H. in July 2017. Further, because the parties were reconciled at that time – the one-week span while Grano was in New York for D.H.'s birth – the Court finds that the parties' agreement was not conditional on any further or future reconciliation. Indeed, there is no evidence to suggest as much. Accordingly, the Court finds that the parties' shared an intent in July 2017 to live together with D.H. in Spain.

95.     The parties' shared intent is further supported by the objective facts surrounding Martin and D.H.'s move to Spain that suggest that the move was indefinite in nature. Martin testified that she sent nearly all of her and D.H.'s belongings to Spain prior to the move. She bought one-way plane tickets. She had no bank accounts or other financial ties to the United States. She had no property interests in the United States, and she signed documents to ensure that Grano could get a mortgage on a home that they intended to and did in fact share in Spain. Martin had an active role in renovating and decorating that home. The electricity bill for that home was in Martin's name. Grano purchased a car for Martin's use in Spain. Martin and Grano made plans to enroll D.H. in school in Spain, with an eye toward his education in future years. Martin had legal status in Spain that essentially equated to that of a Spanish citizen, and D.H. was a Spanish citizen. In fact, Martin registered D.H. as a Spanish citizen on a trip she took to New York in April 2018, after which she returned to Spain and lived with Grano. While Martin testified that she was ambivalent about registering D.H. as a Spanish citizen, and did it only because Grano pressured her to, Martin later testified that she registered D.H. because she did not want him to be "illegal" in Spain and she wanted him to have access to public benefits there. Martin further registered D.H. as a citizen of the town in which they lived after she returned to Spain. These factors overwhelmingly suggest that Martin intended her and D.H.'s stay in Spain to be indefinite. *See*

*Feder v. Evans-Feder*, 63 F.3d 217, 219, 224-25 (3d Cir.1995) (Australia was child's habitual residence where, among other things, parents put their house in United States on the market and sold various personal items in preparation for moving to Australia, purchased home in Australia, pursued employment in Australia, and arranged for child's schooling in Australia); *see also Maxwell*, 588 F.3d at 252 (factors to considering when determining habitual residence include, but are not limited to, where the parent's or child's belongings remain; what was said to family members and friends prior to travel; whether one-way or round-trip tickets were purchased; the location of financial accounts, property interests, or insurance; and the type of travel documents, such as temporary or long-term visas, the parent and child obtained); *Mozes v. Mozes*, 239 F.3d 1067, 1078 (9th Cir. 2001) (where parties take "steps to set up a regular household together," the country of that household is likely the child's habitual residence after an "appreciable" period) (internal quotation marks omitted), *abrogated by Monasky*, 140 S. Ct. 719.

96.     As noted, the Court finds by a preponderance of the evidence that the parties did not have a conditional agreement in September 2017 – as Grano believed that Martin's relocation was indefinite – nor did Martin have a unilateral intent to move back to the United States if her marriage with Grano was not rehabilitated.  Accordingly, the parties' shared intent established in July 2017 remained unchanged through September 2017.  But even if the parties did share an intent in September 2017 to live in Spain conditioned on the rehabilitation of their marriage, that agreement does represent the parties' last shared intent for purposes of habitual residence, because that condition was never satisfied – *i.e.*, Martin and Grano's marriage was not rehabilitated.  *Hofmann*, 716 F.3d at 293; *Mota*, 692 F.3d at 115.  And even if Martin developed such a unilateral conditional intent, because Grano "did not share his wife's understanding, . . . it cannot be said the parents 'shared an intent'" for Spain to be D.H.'s habitual residence in September 2017.  *Mota*,

692 F.3d at 115.  Accordingly, even if the parties had a conditional agreement or Martin had a unilateral conditional intention in September 2017, it would have no bearing on the parties' last shared intent from July 2017.

97.　　　In any event, the parties' last shared intent can no longer be dispositive under *Monasky*.  Thus, even if Martin had or the parties shared a conditional intent to live in Spain as a family, the evidence set forth in ¶ 95 above – *i.e.*, the objective facts suggesting D.H. would remain indefinitely in Spain – is relevant to the habitual residence inquiry.  Even in the pre-*Monasky* landscape, nearly all of the conditional intent cases that Respondent cites also undertake an analysis of the parties' actions in determining whether the relocation was intended to be temporary or indefinite.  *See Guzzo*, 719 F.3d at 111 (no clear error where district court found relocation to Italy temporary in nature where mother and child entered on temporary visas and registered for health care in New York); *Gitter*, 396 F.3d at 135 (no clear error in district court finding relocation to Israel temporary where only father cut ties with New York and no evidence that mother cut any of her ties); *Ruiz*, 392 F.3d at 1257-58 (no clear error where district court found Mexico was not habitual residence where mother "seems to have done nothing in Mexico, beyond taking care of the children, that would indicate that she intended to stay.  To the contrary, she retained bank accounts and credit cards in the United States, and had her nursing license transferred and mail sent to Florida where her sister lived."); *see also Maxwell*, 588 F.3d at 253 ("[T]he district court appropriately determined that the following facts support the conclusion that [mother] intended that the move to Australia would be conditional.  [Mother] left many possessions behind in North Carolina; [mother] reserved round trip tickets for herself and the children; [mother] and the children traveled with Australian tourist visas that limited their stay in Australia to three months; and [mother] maintained her local financial accounts, North Carolina Medicare insurance, and the

lease and insurance on her vehicle."); *Nissim*, 394 F. Supp. 3d at 396 ("The family made the

decision to temporarily relocate to California, as a family, to pursue the lucrative economic

opportunity presented to Petitioner."); *Prinz v. Faso*, No. 03-cv-6653, 2004 WL 1071761, at *5

(W.D.N.Y. May 12, 2004) (finding relocation to Germany was temporary because "[t]he parties

maintained their home in New York, maintained their New York bank and investment accounts,

and maintained their automobiles in the United States. Many of the family's belongings remained

in the United States. While the petitioner provided plausible explanations as to why the home was

not sold, why large items were not shipped, why certain accounts were kept open, and why the

couple maintained their vehicles in the United States, the fact that the parties maintained such

substantial holdings in the United States indicates that there was an intent, at least on behalf of

[mother], that the family could return to life in the United States immediately if any family member

became disenchanted with life in Germany."). Here, unlike the cases on which Respondent relies,

almost all of the factors to be considered in determining whether a move a was temporary or

indefinite support a finding that Martin and D.H.'s move was indefinite.[13]

---

[13] The other cases on which Respondent relies are also distinguishable. In *Hofmann*, the Second Circuit did not disturb a district court's findings that parents had agreed only to a conditional relocation (that they would move to the United States as a family) where the mother developed a unilateral intention to divorce and relocate to the United States without the father "before the family relocation was complete" (before the father, who had been commuting, permanently came to the United States). *Hofmann*, 716 F.3d at 293. Here, the family relocation was not only complete at the time that Martin made the unilateral decision to move to New York with D.H., but Martin took a number of steps to establish her and D.H.'s permanent residence in Spain. Again, the facts of the instant case suggest that Martin viewed the relocation as indefinite, not temporary, as opposed to the father in *Hofmann* who never actually relocated. In *Sanguineti v. Boqvist*, No. 15-CV-3159, 2015 WL 4560787, at *14 (S.D.N.Y. July 24, 2015), the court found that a parent who had conditionally agreed to a relocation "sought the return of [the child] to Quebec *as soon as she began* to feel that the condition precedent to her consent to [the child's] relocation to New York would not be met." (emphasis added). That case is also distinguishable from the instant case, as Martin stated that her rehabilitation attempt was unsuccessful after two weeks, yet she

98.     As the Second Circuit instructs (and as seemingly adopted by the Supreme Court in *Monasky*), "at bottom, [the habitual residence] inquiry is designed simply to ascertain where a child usually or customarily lives." *Saada*, 930 F.3d at 539 (internal quotation marks omitted); *see also Monasky*, 140 S. Ct. at 726 ("The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence."). While intent is helpful to that determination, so too are the objective facts regarding where the child actually lives. Not only do Martin's actions while in Spain suggest that her intent was to indefinitely live there, but those facts also suggest that D.H. "usually or customarily" lived in Spain. D.H. spent less than three months of his life in New York before moving to Spain for nearly a year. While in Spain, his family built a home, discussed long-term education for him, took him to see doctors, and more generally went about living a life there that was settled, not transient. These facts all weigh in favor of finding that Spain is D.H.'s habitual residence. *See id.* ("Italy, where [child] spent almost the entirety of the first two years of his life, is the country where he 'usually or customarily lives.'") (quoting *Guzzo*, 719 F.3d at 109).

99.     Martin argues that the Court should not consider the evidence of Martin's actions while in Spain, because a court's determination regarding whether a move was conditional should primarily focus on the credibility of the parent's testimony, and only secondarily consider whether the actions the parties took suggested that the move was temporary or indefinite. (Doc. 35 ("R's Reply") at 9-10 (citing *Grau v. Grau*, 780 F. App'x 787, 795 (11th Cir. 2019) (*per curiam*) and *Shah v. Federbush*, No. 19-CV-4485, 2019 WL 5060496, at *9 (S.D.N.Y. Oct. 9, 2019), *appeal filed*, No. 19-3713 (2d Cir. Nov. 6, 2019).) That is plainly no longer the law under *Monasky*, but

---

remained in Spain for nearly another year, during which time she (among other things) established a home in Spain, arranged for D.H.'s Spanish education, and traveled to the United States with him and returned to Spain.

even if it were, Martin's testimony was not as credible as she suggests, and thus it does not help her here.  She testified (and argued in her post-hearing briefing) that she did not consider moving back to Spain until August or September 2017, despite the presence of numerous messages that clearly establish she had agreed to return to Spain in July 2017.  Her testimony is largely corroborated only by her interested witnesses, who are either incredible or not supported by documentary evidence despite the voluminous record of messages sent by Martin available in this case.  Moreover, Grano's testimony on the issue of Martin's agreement to return to Spain is credible in that it is largely corroborated by the messages in the record.  Accordingly, Martin cannot succeed here through conclusory statements that she was more credible than Grano.

100.     Martin next argues that, as a victim of coercive control, she could not have a shared intent to relocate to Spain, because coerced residence is not habitual residence within the meaning of the Hague Convention.  (R's Mem. ¶¶ 122-127.)  Petitioner – shockingly – does not address this argument in his reply brief.

101.     Some courts find that habitual residence may not be established if the removing spouse is coerced involuntarily to move to another country.  *See Tsarboupoulos v. Tsarboupoulos*, 176 F. Supp. 2d 1045, 1055 (E.D. Wash. 2001) (if one parent "so dominated decisions and controlled information in the marriage that [the other parent] lacked information regarding" the purpose of the move to a new country, any intention to move to a new habitual residence could not be considered "shared"); *In re Ponath*, 829 F. Supp. 363, 368 (D. Utah 1993) ("[C]oerced residence is not habitual residence within the meaning of the Hague Convention.").  While these holdings are not binding, the Court finds their reasoning persuasive, although only on the issue of shared intent, which is no longer dispositive.

102.     Despite Martin's argument, however, Grano has established by a preponderance of the evidence that Martin's agreement to return to Spain with D.H. was voluntary.  While Martin was the victim of coercive control, Martin's decision making was not "obliterate[d]" at the time she agreed to move back to Spain, as Martin suggests.  At that time, in July through September 2017, Martin had been living in New York without Grano for several months.  While they regularly communicated, there is no indication that at that time Grano was coercively controlling Martin to the extent that her decisions were not acts of her own agency.  In fact, during that span, Grano was suggesting that the parties get divorced, (*see* Tr. at 162:19-21), giving Martin an opportunity to get out of the relationship while being thousands of miles away and surrounded by her family in New York.

103.     The situations that Dr. Favaro described in which a victim goes back to his or her abuser are not present here.  He testified that a victim is likely to go back when it is the only life the victim knows or when the victim does not have an ability to go elsewhere.  But Martin was living at home with her family, thousands of miles away from Grano, and had been living that way for months.  She thus not only had the ability to get away but did in fact get away from her abuser and into a situation in which she was financially and emotionally supported without the need to rely on Grano.  A finding here that Martin was unable to make any voluntary decisions would essentially mean that any time any person was the victim of coercive control, they are never again capable of making a voluntary decision relating to that relationship, which at the very least is not supported by the record here.

104.     The cases on which Respondent relies for this argument are also inapposite.  In *Tsarbopoulos*, the court found that the mother could not have shared an intent to relocate because the father controlled the information in their marriage and concealed certain information that

would have directly impacted her decision regarding relocation.  *See* 176 F. Supp. 2d at 1055.  And in *In re Ponath*, the father took the mother and child on a vacation to Germany, but when the mother tried to return to the United States, the father "refused to permit her and the minor child to return."  829 F. Supp. at 366.  The type of trickery and concealment present in *Tsarbopoulos* and *In re Ponath* are simply not present here.  And while Grano's treatment of Martin is reprehensible, I do not find that it obliterated her decision-making power – at least not in July through October 3, 2017.

105.    In sum, the parties' last shared intent was when they agreed in July 2017 for D.H. to live in Spain and that their life in Spain was to be indefinite, not temporary.  Additionally, D.H. had numerous ties to Spain, including the fact that he spent the majority of his life there before he was unlawfully taken to the United States, he had a home and went to doctors there, and his parents made plans for his future there.  Accordingly, Spain is D.H.'s habitual residence.

**Grave Risk Exception**

106.    "While the Convention is designed, in part, to ensure the prompt return of children wrongfully removed or retained from their country of habitual residence by one parent, it also protects children who, though so removed or retained, face a real and grave risk of harm upon return."  *Ermini v. Vittori*, 758 F.3d 153, 156 (2d Cir. 2014).  Accordingly, even where a petitioner establishes the three elements required to prevail on a claim under the Hague Convention, the Convention provides for a "grave risk exception."

107.    The Convention's grave-risk exception is an affirmative defense that the respondent must prove "by clear and convincing evidence," although "subsidiary facts need only be proven by a preponderance of the evidence."  *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 404 & n.10 (E.D.N.Y. 2005); *see* 22 U.S.C. § 9003(e)(2)(A).

108.    Article 13 of the Hague Convention states that, notwithstanding the other provisions of the Hague Convention,

> the judicial . . . authority of the requested State is not bound to order the return of the child if the person . . . which opposes its return establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Hague Convention, art. 13.  Under Article 13(b), as relevant here:

> [A] grave risk of harm from repatriation arises . . . in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.  The potential harm to the child must be severe, and the . . . level of risk and danger required to trigger this exception has consistently been held to be very high.  The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize.

*Souratgar*, 720 F.3d at 103 (internal quotation marks, emphasis, citations, and alterations omitted). This exception is to be interpreted narrowly, "lest it swallow the rule." *Id.* (internal quotation marks omitted); *see Norden-Powers v. Beveridge*, 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000) ("The level of risk and danger required to trigger this exception has consistently been held to be very high.") (collecting cases).

109.    "The Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Souratgar*, 720 F.3d at 104.  But "[e]vidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse," though "[e]vidence of this kind . . . is not dispositive in these fact-intensive cases." *Id.* (internal quotation marks, alteration, and citation omitted).

110.    For the exception to apply, the child need not have "previously been physically or psychologically harmed," but the court must determine that repatriation will "expose him to a

present grave risk of physical or psychological harm, or otherwise place him in an intolerable situation." *Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008). "Sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." *Souratgar*, 720 F.3d at 104 (collecting cases); *see Ermini*, 758 F.3d at 165. Under certain circumstances, however, "witnessing the abuse of [one's] mother is enough to establish the applicability of the defense." *Mohacsi v. Rippa*, 346 F. Supp. 3d 295, 320, 322 (E.D.N.Y. 2018), *appeal filed*, No. 18-3627 (2d Cir. Dec. 6, 2018); *see Davies v. Davies*, 717 F. App'x 43, 49 (2d Cir. 2017) (summary order) (finding no error in district court's grave risk finding "premised on overwhelming evidence of Mr. Davies's extreme violence and uncontrollable anger, as well as his psychological abuse of Ms. Davies over many years, much of which was witnessed by K.D.") (internal quotation marks and emphasis omitted).

111.    "[T]he exercise of comity that is at the heart of the Hague Convention requires us to place our trust in [other signatories'] courts to issue whatever orders may be necessary to safeguard children who come before them." *Saada*, 930 F.3d at 539-40 (internal quotation marks and alterations omitted). Thus, even where a child is at grave risk if repatriated, the principles of comity require the Court to "determine whether there exist alternative ameliorative measures that are either enforceable by the District Court or, if not directly enforceable, are supported by other sufficient guarantees of performance." *Id.* at 541. The Court may consider, among other things, "whether [the other country's] courts will enforce key conditions" to protect the child. *Id.*

112.    "At the same time, the jurisdiction of our district courts is not limitless," and while U.S. district courts "are free to enter conditional return orders," they "retain no power to enforce those orders across national borders." *Id.* at 540 (internal quotation marks omitted). Thus, "in

cases in which a district court has determined that repatriating a child will expose him or her to a grave risk of harm, unenforceable undertakings are generally disfavored, particularly where there is reason to question whether the petitioning parent will comply with the undertakings and there are no other 'sufficient guarantees of performance.'" *Id.* (footnote omitted)

113.     Most of Respondent's grave risk argument centers on her allegation that she was the victim of coercive control. As noted, the Court finds that Martin was in fact the victim of Grano's coercive control. The Court does not, however, find that Martin has carried her burden to establish by clear and convincing evidence that Grano poses a grave risk to D.H. by virtue of his coercive control over Martin. Martin argues that Grano's abuse directed toward her, some of which D.H. observed, establishes that Grano poses a grave risk to D.H. But that is not supported by the evidence, nor is it supported by any case law holding that the type of abuse D.H. observed can establish that D.H. himself faces a grave risk if repatriated.

114.     As a threshold matter, apart from Grano grabbing Martin by the arm on one occasion, Martin's allegations of physical abuse are either exaggerated or fabricated. Accordingly, the abuse alleged here is largely psychological in nature. The Court recognizes the seriousness and harm from psychological abuse, but the issue here is how a small child would perceive and be affected by such abuse and whether it would harm him. While D.H. was exposed to some of Grano's psychological abuse of Martin, and while there is a chance that he will be exposed to it in the future (though likely on a much lesser scale now that Grano and Martin are not together), D.H. is not at a grave risk of being the victim of abuse himself. First, there is simply no evidence that Grano abused D.H. While Respondent testified that Grano yelled at her while she held D.H. and that Grano even screamed at the baby "a couple of times," (Tr. at 653:6-24, 654:10-15, 731:13-732:6), these allegations do not establish "a sustained pattern of physical abuse" or "a propensity

for violent abuse." *Porretti v. Baez*, No. 19-CV-1955, 2019 WL 5587151, at *9 (E.D.N.Y. Oct. 30, 2019) ("Evidence of sporadic or isolated incidents of abuse . . . have not been found sufficient to support application of the grave risk exception."). Indeed, as noted, courts have "been careful to note that" even "sporadic or isolated incidents of physical discipline directed at the child . . . have not been found to constitute a grave risk," *Ermini*, 758 F.3d at 165 (alteration omitted), so here, where the conduct directed against D.H. was sporadic and only verbal, it does not establish that D.H. faces a threat of severe harm if repatriated. Additionally, while Martin argues that "the scientific evidence establishes that Mr. Grano may have caused physical and psychological harm to D.H. by abusing Ms. Martin verbally, psychologically, and via coercive control while she was pregnant," (R's Mem. ¶ 139), she does not provide facts to suggest that D.H. did in fact suffer such harm.

115. Instead of providing a factual basis that D.H. has been or will be physically or psychologically harmed, Martin instead cites to a number of cases in which courts have found that a child's observation of abuse may be enough to establish grave risk. But none of those cases are analogous. Martin cites only one case in which the court held that "'[p]sychological abuse of the respondent alone, in the form of shouting or other displays of uncontrolled anger in the presence of the child, can support an Article 13(b) defense if it is substantial and pervasive.'" *Valles Rubio v. Veintimilla Castro*, No. 19-CV-2524, 2019 WL 5189011, at *22 (E.D.N.Y. Oct. 15, 2019), *appeal filed*, No. 19-3740 (2d Cir. Nov. 12, 2019; *see* R's Reply ¶ 24. But this statement is *dictum*, as the *Valles Rubio* Court ultimately found that the petitioner's abuse was not sufficiently severe to trigger the grave risk defense.[14] Respondent has failed to identify a single case in which a

---

[14] The *Valles Rubio* court supported this *dictum* with a citation to *Davies*, 717 F. App'x 43, but, as discussed in ¶ 117 below, *Davies* was not a case in which psychological abuse of the other parent was sufficient to establish grave risk to the child, as it involved physical violence as well.

petitioner's psychological abuse of a respondent was, on its own, enough to establish that their child was at grave risk of future physical or psychological harm. Instead, nearly every case Martin cites that found that the child faced a grave risk included evidence that the respondent – or even the child – was physically abused, and usually severely so. *See Ermini*, 758 F.3d at 157 (petitioner had "a history of physical violence" and "was in the habit of striking the children") (internal quotation marks omitted); *Baran*, 526 F.3d at 1346 ("[Petitioner] was physically and verbally abusive toward Beaty in Sam's presence, [and petitioner] physically endangered Sam (both intentionally and unintentionally) when Sam lived under his roof . . . ."); *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007) ("The nature of abuse here was both physical (repeated beatings, hair pulling, ear pulling, and belt-whipping) and psychological . . . ."); *Van De Sande v. Van De Sande*, 431 F.3d 567, 569 (7th Cir. 2005) ("Physical abuse of the daughter by her father began when she started wetting her bed."); *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000) ("[Petitioner] has demonstrated an uncontrollably violent temper, and his assaults have been bloody and severe."); *Mohacsi*, 346 F. Supp. 3d at 321 ("Petitioner admitted to physically assaulting Respondent on more than one occasion, and his physical abuse includes one incident in which he nearly choked her to death."); *Ischiu v. Garcia*, 274 F. Supp. 3d 339, 353 (D. Md. 2017) ("[Respondent] also suffered physical abuse at the hands of her husband," including "smashing her in the face and knocking her to the ground"); *Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 554 (E.D. Pa. 2010) ("Respondent testified credibly about extensive physical and emotional abuse she suffered throughout her marriage. She testified that the Petitioner beat her repeatedly and, at one point, broke her nose.") (footnote omitted); *Elyashiv*, 353 F. Supp. 2d at 409 (while one of petitioner's children was not physically abused, petitioner abused his other children); *Tsarbopoulos*, 176 F. Supp. 2d at 1060 (numerous allegations of physical abuse); *Krishna v.*

*Krishna*, No. 97-CV-0021, 1997 WL 195439, at *1 (N.D. Cal. Apr. 11, 1997) ("Ms. Krishna alleges that Mr. Krishna has regularly beat her since her son's first birthday and that Mr. Krishna beat her seriously on five separate occasions," and on at least one occasion Ms. Krishna's allegations were corroborated).

116.    The remaining case on which Martin relies, *Davies v. Davies*, No. 16-CV-6542, 2017 WL 361556 (S.D.N.Y. Jan. 25, 2017), *aff'd*, 717 F. App'x 43, is also inapposite.  In her reply brief, Martin argues that Grano's conduct closely mirrors the father's conduct in *Davies*, in which the court found that the father posed a grave risk to his child.  But Martin cherry-picks analogous facts from that case while ignoring crucial ones that show why the father's conduct there is different from Grano's here.  There was credible evidence in that case that the petitioner "frequently" pushed the respondent; "frequently grabbed" the child and screamed at him and called him names; aggressively overreacted to the child's misbehavior by, among other things, slamming on the car brakes if the child did not put his seatbelt on; broke the family puppy's leg, which the child witnessed; threw things at the respondent while she held the child; "acted violently towards [respondent] in front of [the child]"; keyed a stranger's car; threatened to beat and kill people who he did not like or believed crossed him; violently kicked a dog that was not his; hurled a glass at his wife; and kicked and shattered a glass door while acting "violently angry."  *Davies*, 2017 WL 361556, at *3-8.  Put simply, the petitioner in *Davies* exhibited far more violent, erratic, and threatening behavior than Grano did here.  In sum, none of the cases that Martin cites support her argument that there is precedent to establish that Grano's behavior poses a grave risk to D.H.

117.    While it is conceivable that Grano's temper, insults, and propensity for abusive behavior could be visited on D.H., the high legal bar for a grave risk defense requires significantly more.  Martin has not shown that the way Grano treated her poses a grave risk that Grano will

abuse D.H. under the prevailing case law.  Accordingly, the Court finds that Martin has failed to establish the grave risk exception by clear and convincing evidence.

118.     Because Martin has not proven that Grano poses a grave risk to D.H., there is no need to discuss Spain's ability to protect D.H. or potential undertakings and ameliorative measures. That said, the Court notes again, for the record and for the use of any court that takes up custody or divorce proceedings in the future, that it has found that Grano exerted coercive control over Martin, which is undoubtedly a serious form of domestic abuse.  The Court likewise observes that Grano has almost no experience caring for D.H. without Martin or Grano's parents being present. The Court is confident that the courts of Spain will appreciate the implications of those facts.

119.     Based on the foregoing, Grano's petition for the return of D.H. to Spain is GRANTED.  Because the Hague Convention requires the "prompt" return of the child to the country of habitual residence, this Court will grant a stay of return until March 25, 2020, at 5 p.m. to permit a stay application to be made to the United States Court of Appeals for the Second Circuit, and otherwise denies a stay pending appeal.

**SO ORDERED.**
Dated: March 11, 2020
        White Plains, New York

_____
        CATHY SEIBEL, U.S.D.J.